# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EXZETTA STEELE,

     *Plaintiff,*

vs.

                                        Case No. 14-2094-EFM

CITY OF TOPEKA, KANSAS,

     *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Exzetta Steele's race and gender made her unlike any other manager in Defendant City of Topeka's Street Maintenance and Traffic Operations Division ("Division"). No other Division manager was African-American. No other Division manager was a woman. And, according to Steele, she suffered because of these differences. Once she had suffered enough, she left the Division for other work with the City. Then she sued the City. Did Steele suffer the kind and degree of workplace discomfort necessary under Title VII to hold the City liable for her departure from the Division? The outcome of the City's present summary judgment motion depends on whether evidence tends to support Steele's claims that disparate treatment and a hostile work environment forced her to quit. Because no evidence could show a legally intolerably workplace, the Court grants summary judgment on Steele's claims against the City.

# I.     Factual and Procedural Background[1]

Before becoming the only African-American and woman manager in the Division, Steele performed nearly ten years of office and accounting work for the City.  On November 29, 2010, Steele left her accounting specialist position in the City's Fire Department to join Joe Brooks as one of the Division's two Maintenance Managers.  As Maintenance Managers, Steele and Brooks assigned and oversaw the completion of street maintenance projects (e.g. filling potholes, grading alleyways, installing curbs, sweeping streets, and snow and ice removal).  Above Steele and Brooks in the Division's managerial hierarchy, the City employed James Lopez and Ron Raines.  Lopez supervised the Maintenance Managers' work.  Raines supervised the entire Division.  Among these non-African-American men, Steele worked without performance-based criticism for five months.  But in late April 2011, Steele quit her higher-salary, managerial position in the Division to return to her lower-salary, non-supervisory accounting work in the City's Fire Department.  So what happened?

An ultimately unbearable pattern of unfavorable, and allegedly unlawful, workplace interactions happened, according to Steele.  The parties reconstruct that alleged pattern from the following uncontroverted circumstances—introductorily characterized in italics.

*Training.*  Steele joined the Division two weeks after Brooks, her Maintenance Manager counterpart.  Brooks received roughly two weeks of training from Division coworker Terry Tillman.  Before the Division employed Brooks and Steele, Tillman handled the Maintenance Mangers' responsibilities.  Raines denies specifically assigning Tillman Maintenance Manager training responsibilities.  Nevertheless, Tillman trained Brooks on and off job sites.  Tillman

---

[1] In accordance with summary judgment procedures, the Court relates the following uncontroverted facts in the light most favorable to Steele, the non-moving party.

familiarized Brooks with various equipment and machines; surveying work sites; classifying and prioritizing street defects; preparing and processing work orders; and using City Works, the City's computerized work assignment process and recording system.   But Tillman's training efforts interfered with his own work.   Two weeks into training Brooks and when Steele reported for work at the Division, Tillman discontinued formal Maintenance Manager training.   Tillman believes that Raines ordered him to return to his normal job functions and expected Brooks to accustom Steele with her Maintenance Manger duties.   Raines recalls that when Steele began, he encouraged all Division employees to help Steele learn her responsibilities; specifically, however, he privately imagined that Brooks would train Steele.   Brooks denies receiving specific orders to train Steele.   Yet during Steele's first month in the Division, Brooks worked closely with Steele to perform the Maintenance Mangers' responsibilities as a team.   Primarily assisted by Brooks, Steele learned the same skills that Tillman covered with Brooks.   And despite ending formal training, Tillman continued to provide informal "sidebar training"—meaning that Tillman provided job-related advice concerning particular tasks on Brooks' or Steele's ad hoc request. Ultimately, both Brooks and Steele considered their respective training insufficient, leaving them to "sink or swim" on the job.

    *Snow Removal Shift Assignment.*   The Division's snow removal season coincided with Steele's arrival.   Typically, all Division employees worked from 7:00 am to 3:30 pm.   During snow removal operations, however, Steele and Brooks alternatively worked 12-hour shifts. Consulting Raines but not Steele, Brooks worked out the Maintenance Managers' snow-event shift assignments.   Steele worked the 7:00 am to 7:00 pm day shift—a shift that Brooks thought better-suited for Steele because, unlike him, she had a child living at home.   Brooks worked the

7:00 pm to 7:00 am night shift. And Raines usually worked snow removal operations during the night shift.

*Snow-Event Notice.* As the Maintenance Managers' direct supervisor, Lopez sometimes notified Steele and Brooks of the need to report for snow removal operations. And for communications generally, Lopez communicated with Steele and Brooks through text messages or emails. Many Division employees, however, acknowledged that phone notification constituted the best, if not standard, practice for time-sensitive removal operations. Seven winter weather events requiring removal operations occurred during Steele's tenure with the Division. Before the last snow event of the season, Steele requested that, if needed, Lopez call her. Lopez emailed or texted Steele notice of the need to report. Steele did not become aware of Lopez's notice in time to organize a snow removal crew. She called Tillman to explain her delay and immediately reported to work. In her brief absence, Tillman notified crews to report for snow removal operations. Although delayed, the Division accomplished its snow removal operations. No evidence indicates that the Division disciplined anyone for the delay.

*Office Dynamics.* With respect to formal meetings, informal coworker interactions, and work assignments, Steele felt that Raines and Lopez included her less than they included Brooks. As often as held, Steele attended weekly management team meetings. At these meetings, Raines appeared to interact with Brooks more than Steele. Outside these meetings, Steele felt similarly excluded. Often during her shifts, Steele worked away from the Division with her crews at work sites. Brooks and Raines, however, typically worked their shifts at the Division. Brooks completed administrative paperwork work in his office. Raines usually kept to his office and limited his interaction with others, but not always. Division employees observed Raines, Lopez, Brooks, and occasionally Tillman sometimes gathering in Raines' office and once going out to

lunch.  But no employee explained the frequency or purpose of the gatherings.  Those details aside, Raines and Lopez kept Brooks more involved in work projects than Steele; at least, it appeared that way to Steele, Brooks, and one other Division employee.  Raines and Lopez assigned projects that required immediate attention to the Maintenance Manager most readily available.  Steele sometimes received work assignments indirectly from Raines or Lopez through Brooks or Tillman.  Other times, Steele learned that Brooks completed work assignments without her involvement.  According to Brooks, projects often came through him because he was present at the Division, and he would volunteer to contact Steele as necessary.  Under these circumstances, Steele felt ignored by Raines.

*Coworkers' Comments.*  Even when conversing with her supervisors, Steele sometimes felt marginalized.  Raines and Lopez each made a comment that offended Steele.

The morning of a January snow event, Raines interrupted a meeting between Steele and her crew.  According to Steele, Raines entered and announced, "Stop, she doesn't know what she's talking about."  Raines then corrected a report—which he had given Steele before the meeting—that the Division lacked salt for that day's snow removal operations.  Steele approached Raines later that day.  Steele explained that she respected Raines' decision to inform the crews but did not appreciate how he chose to communicate that information.  During the private conversation that followed, Raines praised Steele for the work she was doing, and according to Steele, he added, "They really don't expect you to survive because of the A factor."  Steele asked Raines to clarify his statement: "What do you mean by the A factor?  The fact that I'm a woman?"  But by Steele's account, Raines only laughed and walked away.  Steele considered this exchange offensive.  For his part, Raines does not recall using the phrase "A factor" in a private discussion with Steele.  He does, however, recall attending a Division

management team meeting that focused on strategies for dealing with employees of different personality types.  At that meeting, Raines mentioned that Type A personality individuals had challenged the management team and would likely challenge Steele.

On February 23, Steele asked Lopez for approval to assign a pothole-repair project to the night crew.  Lopez approved the request, and according to Steele, joked that "the only thing [the crew] had to worry about was getting shot."  Steele attended a church located near the pothole, and she believed that Lopez knew that fact.  Thus, Steele considered Lopez's comment offensive—reflective of a racist attitude that areas predominately populated by African-Americans endangered crews more than areas populated by other demographics.

*Remedial Efforts.*  After Lopez's comment, Steele made her first visit to the City's Human Resources Division.  Steele intended to speak with Jacque Russell, the City's HR Director.  But Russell was unavailable.  Instead, Steele spoke with another HR employee, Cindy White.  Steele unburdened herself to White.  Referencing notes in her electronic day planner, Steele explained the reasons she felt marginalized by others in the Division.  White comforted Steele and suggested that Steele discuss her frustrations directly with Raines and Lopez.  White also advised Steele to schedule an appointment with Russell.

Steele followed White's advice.  Steele arranged to meet with Russell on February 28, less than a week later.  Before that appointment, Steele also spoke privately with Raines and then with Lopez.  For the first time, Steele shared with each of her supervisors the frustration she felt working in the Division.  Steele explained to each supervisor that their respective conduct caused her to feel singularly ignored and disrespected.  Raines apologized, emphasizing that he never realized that Steele felt mistreated by him, nor did he intend to mistreat her.  Lopez too apologized and promised to improve.

At her appointment with Russell, Steele repeated the concerns that she expressed to White, Raines, and Lopez in the preceding week.  Again referencing her day planner notes, Steele described the workplace incidents that she considered marginalizing.  Steele represented that the Division was not adhering to the prescribed management structure, Raines was ignoring her, she felt excluded from meetings, Lopez made a remark offensive to her, and the stress resulting from it all caused her migraines and diabetes symptoms to worsen.  Russell sympathized with Steele and encouraged her for sharing her feelings.  Steele also revealed to Russell that, only days before and for the first time, she expressed her frustrations to Raines and Lopez.  Russell instructed Steele to "keep her posted."  Satisfied merely to discuss her complaints with Russell, Steele declined to prepare a formal, written complaint.

Steele deemed these exchanges cathartic.  In the two weeks that followed, Steele considered her working environment improved.

Sometime in mid-March, however, Steele felt differently.  Steele started noticing a return of the behaviors that originally frustrated her.  On March 17, Steele briefly encountered Russell at a meeting.  Russell inquired about Steele's situation, and Steele responded that she was "hanging in there."  On April 10, Steele became aware of a YouTube video that depicts occupants of a truck recording her and other Division employees working on a road project.  Entirely out of frame, the video's anonymous truck occupants privately make statements implicating Steele's race and gender.  The video offended Steele.  Steele discussed her concerns about the video with HR.  Ultimately, neither HR nor the City's Chief of Police could identify the video's creators.

*Return to Previous Work.*  Also during the week of April 10, Steele received a call from the City's Fire Chief.  The City's Fire Chief learned from Steele's friend that Steele was unhappy

working in the Division, and he decided to contact Steele.  The Fire Chief told Steele that his department was one accountant short, and he invited Steele to consider taking the position.  After that call, Steele contacted HR to meet with Russell before the weekend.  Russell was unavailable to meet and informed Steele that once her child recovered from surgery, she would meet with Steele.  Steele did not wait.  Instead, Steele arranged a meeting with the City Manager.  On April 18, the City Manager met with Steele.  After discussing the specific difficulties she faced working in the Division, Steele requested that the City Manager support her move to the Fire Department's vacant accounting position.

One day later, Russell visited the Division to finalize Steele's move to the Fire Department.  Initially, Russell spoke privately with Steele.  Russell explained that the City Manager authorized Steele's request.  Russell advised Steele that the position change would result in a $2.78 per hour wage pay reduction.  And before asking others to join their meeting, Russell asked Steele if she wanted time to contemplate her decision to return to the Fire Department.  Steele declined Russell's offer and expressed her desire to proceed with the move.  Raines and another Public Works Department director, Braxton Copley, then joined the meeting.  Russell announced Steele's decision and reviewed with the directors the circumstances that motivated Steele's decision.  Surprised at Russell's report, Copley pleaded with Steele to reconsider her decision.  But Steele refused, and the conversation turned toward deciding the logistics of Steele's move.  All agreed that Steele would continue working in the Division until the day that Brooks returned from vacation to work, April 29.

On May 9, Steele reported to the Fire Department to begin her accounting work.

*Lopez's Job Reclassification*.  Steele was not the only Division employee who moved to a new position in the 2011 spring.  Before meeting with Russell on April 19, Steele learned that

Lopez would undertake the responsibilities of a different position in the Division.  When Lopez officially assumed his new position on May 6, his Quality Assurance Manager title and rate of pay remained unchanged.  On or soon after May 6, however, the City reclassified Lopez's position so that he performed the job duties and responsibilities previously assigned to the Inspection and Quality Assurance Coordinator position.  So rather than having the primary job responsibility to supervise the Maintenance Managers, Lopez assumed the responsibility to supervise all Division projects performed by private contractors and, as before, to generally ensure the maintenance and repair of City streets, roads, curbs, gutters, and related infrastructure.  Brooks observed that, in his reclassified role, Lopez no longer supervised Division employees but worked primarily on his own.  Still, however, Brooks continued to direct his work communications to Lopez.

*Lawsuit*.  In February 2014, Steele sued the City under Title VII.  Now, the City moves for summary judgement on Steele's remaining two claims—that (1) disparate treatment and (2) a hostile work environment respectively forced Steele to accept alternative employment with the City.  Below, the Court explains why Title VII does not render the City liable for Steele's departure from the Division.

## II.    Legal Standard

At summary judgement, Steele's claims live or die by the production of certain evidence. The Court must grant summary judgment if the movant, the City, shows that the genuinely undisputed facts legally entitle it to judgment.[2]  Claim by claim, Steele can create a "genuine," summary-judgment-denying factual dispute if she produces evidence that would permit a

---

[2] Fed. R. Civ. P. 56(a).

reasonable jury to decide the essential issues in either her or the City's favor.[3]  But initially, she need do nothing.  The City bears the initial burden to show the absence of evidence essential to Steele's claims.[4]  If the City shoulders its burden, then Steele must act.  Steele may not simply rest on her pleadings or other conclusory allegations; she must instead "set forth specific facts" using evidence that would be admissible at trial, and those facts must enable a rational factfinder to find for her.[5]  The parties must clearly identify their facts through "particular" citation to affidavits, deposition transcripts, incorporated documentary exhibits, or other admissible evidence.[6]  Once the parties complete the summary judgment record, the Court's work begins.  While considering whether the parties meet their respective burdens of production, the Court views all the particularly cited evidence and reasonable inferences therefrom in the light most favorable to the nonmovant, Steele.[7]

Title VII complicates these procedural rules with an added burden-shifting framework, at least in cases where plaintiffs, like Steele, offer indirect discrimination evidence.[8]  With respect to each of her claims, Steele carries the initial burden of establishing a prima facie case of discrimination.  Second, the burden shifts to the City to provide a legitimate, nondiscriminatory reason for its actions.  Third, the burden then returns to Steele to prove that the City's stated

---

[3] *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016).

[4] *Id.*

[5] *Id.* at 1137–38.

[6] Fed. R. Civ. P. 56(c); *see also Savant Homes, Inc.*, 809 F.3d at 1137.

[7] *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1972).

reasons for its actions are a pretext for discriminatory intent.[9]  If a party fails to meet its burden at any step, the Court's inquiry ends and judgment as a matter of law should be entered against the unsuccessful party.[10]

### III.    Analysis

An employer generally breaks Title VII's anti-discrimination law if, ultimately, it conditions an employee's employment, compensation, terms, or privileges on membership to a specific race or gender.[11]  Effectively, Steele argues that the City conditioned her employment on her race and her gender.  Specifically, Steele claims that disparate treatment and a hostile work environment adversely affected her employment by causing a "constructive demotion/discharge."[12]  Below, the Court explains why Steele's circumstances could not enable a reasonable factfinder to conclude that the City unlawfully prejudiced her employment.

**A. Disparate Treatment**

Steele first claims by indirect evidence that the City is liable for race-based and gender-based disparate treatment that left her no choice but to quit her Maintenance Manager position.

---

[9]  *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221–22 (10th Cir. 2015) (applying *McDonnell Douglas* framework to hostile work environment claim); *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011) (applying *McDonnell Douglas* framework to disparate treatment claim).

[10]  *McDonnell Douglas*, 411 U.S. at 807.

[11]  42 U.S.C. § 2000e-2(a).

[12]  For the purposes of this Order, the Court need not strictly classify Steele's "constructive discharge/demotion" claim as either a constructive discharge or a constructive demotion.  The parties agree that the same legal standard governs both theories.  And the Court is comfortable proceeding under that legal standard.  For convenience only, the Court hereafter will use "constructive discharge" to refer to Steele's "constructive discharge/demotion" theory.  But the proof of that theory (and its accompanying claims) will, as the parties agree, depend on whether Steele "produce[s] facts suggesting that [her] workplace was objectively intolerable such that a reasonable employee would have no choice but to quit." *Johnson v. Weld Cty.*, 594 F.3d 1202, 1217 n.6 (10th Cir. 2010).

Steele's prima facie case requires evidence that she suffered an "adverse employment action."[13] Proof of constructive discharge satisfies the adverse employment action requirement.[14]

Constructive discharge is not proven easily.  Steele bears a "substantial" evidentiary-production burden.[15]  Steele must produce evidence showing that she involuntarily left the Division—specifically meaning that the City, by unlawful acts, made her working conditions so intolerable that a reasonable employee in her position also would have felt forced to quit.[16]  The law expects employees to tolerate merely "difficult or unpleasant" working conditions; but undesirable working conditions become legally intolerable once those conditions leave an employee that seeks relief no other reasonable choice but to quit.[17]  The totality of the circumstances determines the voluntariness of an employee's decision to quit.[18]

The collective circumstances faced by plaintiff Maxine Acrey illustrate the type of evidence required to show legally intolerable working conditions.[19]  After more than 25 years' accounting experience and 5 years accounting service to her employer, 50-year-old Acrey

---

[13] *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011).

[14] *Fischer v. Forestwood Co.*, 525 F.3d 972, 979 (10th Cir. 2008).  With respect to discriminatory adverse employment actions other than constructive discharge, Steele's responsive brief discusses the prima facie case for a disparate training claim.  *See Richardson v. Blue Cross/Blue Shield of Kan., Inc.*, 196 F. Supp. 2d 1174, 1181 (D. Kan. 2002).  Like the City, the Court is skeptical that Steele's "disparity in treatment" assertion in the Pretrial Order clearly (or fairly) amounts to the specific disparate training claim that her response discusses.  And that discussion is light.  Steele recites disparate training's prima facie elements and asserts the corresponding legal conclusions.  But Steele offers no authority-backed analysis to support her assertions.  She presents no evidence, as she must, that lacking "the training she desired but failed to receive . . . had any impact whatsoever upon her position or her ability to retain it." *Id.* at 1184.

[15] *Fischer*, 525 F.3d at 980.

[16] *Id.*

[17] *Potts v. Davis Cty.*, 551 F.3d 1188, 1194 (10th Cir. 2009) (quotation omitted).

[18] *Fischer*, 525 F.3d at 980.

[19] *See Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569 (10th Cir. 1992).

resigned.  Acrey's working conditions deteriorated amidst a corporate merger.  That merger involved consolidating the corporations' distinct accounting records and ultimately adopting more complex accounting practices.  Following the merger, Acrey's supervisors routinely "confronted her with a litany of performance shortcomings;" excluded her from meetings; deprived her of long-standing job responsibilities; and denied her essential information and training to operate under her employer's new accounting system.  One supervisor asked her to resign or "be fired."  At least twice, another supervisor asked her to quit, referencing her age and "image."  And also before she became "too tired" to resist resigning, her immediate supervisor discussed with another, younger employee the possibility of replacing Acrey; that 27-year-old employee eventually replaced Acrey.[20]  Together, these circumstances convinced the Tenth Circuit that Acrey's "supervisor[s] made it nearly impossible for [her] to continue performing her job;" thus, Acrey produced trial-worthy evidence of constructive discharge.[21]

Against these standards, Steele's evidence fails to measure up.  Steele argues that she involuntarily quit because: (1) she received dissimilar training from Brooks; (2) Brooks determined snow removal shift assignments and received work assignments without consulting her; (3) Lopez failed effectively to notify her of a snow event; (4) coworkers excluded her from meetings; (5) Raines ignored her but interacted with Brooks; (6) Raines and Lopez each made a comment that offended her; (7) HR ineffectively addressed her complaints; and (8) unlike Steele, Lopez assumed different job responsibilities without earning less pay.[22]

---

[20] *Id.* at 1572–74.

[21] *Fischer*, 525 F.3d at 981 (discussing *Acrey*, 981 F.2d at 1574).

[22] The City initially objects to certain of these arguments because they raise matters excluded from the Pretrial Order.  Strictly speaking, the Court agrees with the City's position.  But like the City, the Court will

Unlike Acrey, Steele produces inadequate evidence to show that her coworkers made it nearly impossible for her to perform her work and forced her to quit.

Initially, Steele's circumstances lack the job-jeopardizing character of Acrey's circumstances. Acrey's employers severely criticized and undermined her work, asked her to quit, and prematurely prepared to replace her.[23] Other employees have proved constructive discharge with evidence that they faced either pervasive criticism and work-defeating interference or ultimatum-like proposals to quit.[24] Steele lacks such evidence. Steele's supervisors did not criticize her job performance. Apart from Lopez's ineffective snow removal notice (discussed below), Steele offers no evidence that her coworkers denied her requested information or cooperation to perform her job responsibilities. No one in the Division asked or threatened Steele to leave her position. And until Steele first communicated her intention to quit, no one in the Division arranged for Steele's departure or replacement. In short, Steele lacks the most potent evidence that would enable a factfinder to decide that she involuntarily quit under the reasonable "belie[f] her job was in jeopardy."[25]

Broadly speaking, all that remains is evidence that Steele's coworkers made her working conditions more difficult or unpleasant. No jury could find from the produced evidence that the

---

comprehensively analyze Steele's entire response on the merits. And merits considered, no prejudice to the City results.

[23] *Acrey*, 981 F.2d at 1572–74.

[24] *See Strickland v. UPS, Inc.*, 555 F.3d 1224, 1229 (10th Cir. 2009); *James v. Sears, Roebuck and Co.*, 21 F.3d 989, 993–94 (10th Cir. 1994); *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1154–55 (10th Cir. 1990); *Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 178 (10th Cir. 1986).

[25] *Strickland*, 555 F.3d at 1229; *see also Acrey*, 981 F.2d at 1572 (deciding that a jury could believe that "plaintiff reasonably believed she was at risk of losing her job").

City made it nearly impossible for Steele to perform her work.  Why?  Consider Steele's circumstances as evidenced, not as argued.

First, Steele argues that she received training inferior to Brooks' training.  Most of Brooks' training formally came from Tillman.  Steele's training came mostly from Brooks and only informally from Tillman.  Otherwise put, the City did not identically train Steele and Brooks.  But the law does not require perfectly identical training.  Acrey's supervisors denied her *essential* training, thus making her work "nearly impossible" to perform.[26]  The available evidence does not show that the City denied Steele essential training.  Brooks and Steele learned the same Maintenance Manager skills.  Steele fails to produce evidence showing any job functions, essential or otherwise, that her training left her unable to perform.  In conclusory fashion, she claims—like Brooks—that she felt undertrained for her overwhelming, new work.  In that sense, Steele's non-identical training resembles the legally permissible inconvenience of "requiring an employee to develop new skills" in an unstructured work environment.[27]  A reasonable employee who received Steele's non-identical training would not, on that basis, feel forced to quit.

Second, Steele argues that Brooks and Raines consulted to decide Maintenance Manager matters without her.  Brooks influenced Steele's snow shift assignment without consulting her.  He decided that he ought to work the night shift and leave the day shift to Steele.  Raines approved Brooks' decision.  Raines also appeared to keep Brooks—who worked away from the office less than Steele—more involved in work projects.  Again, the evidence shows that the City did not identically manage Steele and Brooks.  Yet no evidence shows that the City's

---

[26] *Acrey*, 981 F.2d at 1572.

[27] *See Tran v. Trs. of State Colleges in Colo.*, 355 F.3d 1263, 1268, 1270–71 (10th Cir. 2004).

involvement with Brooks in Maintenance Manager matters intolerably altered the circumstances of Steele's employment.  Steele continued to receive work assignments suitable to her position.  In the zero-sum, shift-assignment scheme, she ended up working occasional snow events during day-shift hours that largely overlapped with her normal work hours.  And no evidence shows that Brooks' involvement denied Steele any "long-standing job responsibilities" or related entitlements.[28]  Facing the circumstances of Steele's shift and work assignments, no reasonable employee would feel forced quit.

Third, Steele argues that against her instruction to call, Lopez ineffectively notified her by email of a snow event.  True—Lopez failed effectively to convey time-sensitive information that Steele needed to timely organize snow removal crews.  And that error understandably frustrated Steele.  But Lopez did not entirely withhold necessary information, like Acrey's supervisors.[29]  Nor did Lopez repeat his error.[30]  And no evidence indicates that this single communication error caused the City to criticize or discipline Steele, alter her job responsibilities, or otherwise take any action adverse to her.  Lopez's one-time snow notification error made Steele's job more difficult, not intolerable or nearly impossible to perform.

Fourth and fifth, Steele argues that her coworkers excluded her from meetings and that Raines ignored her.  Steele's coworkers gathered without her once for lunch and occasionally at the office.  No evidence shows that these gatherings implicated Maintenance Manager job

---

[28] *Acrey*, 981 F.2d at 1572, 1574.

[29] *See id.* at 1572 ("information that [plaintiff] needed to formulate the budget was withheld from her").

[30] *See MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1280–82 (10th Cir. 2005) (deeming a coworker's isolated "failure to diligently and timely inform" plaintiff of work-related information an inconvenient and nonadverse employment action).

responsibilities, let alone that Steele's work depended on attending these gatherings.[31]   Non-speculative inferences in Steele's favor, Steele's coworkers spoke to one another more than to her.   But the passive non-involvement Steele experienced, albeit unpleasant, amounts to legally tolerable "snubs."[32]   And snubs notwithstanding, the non-involvement did not leave Steele unable to perform her work and with no choice but to quit.

Sixth, Steele argues that her supervisors made sexist and racist remarks to her.   Steele identifies two comments that occurred over the course of her roughly five-month employment at the Division.   Neither remark overtly implicates Steele's gender or race.   But even so, offensive comments seldom create intolerable working conditions,[33] without being overtly discriminatory, direct, and associated with suggestions that an employee quit.[34]   Insensitive but not intolerable, the remarks directed at Steele would not force a reasonable employee to quit.

Seventh, Steele argues that HR ineffectively responded to her complaints.   Steele initially consulted HR on February 23 (a Wednesday) and February 28 (the following Monday).   At her first HR visit, the available HR employee suggested that Steele discuss with her supervisors her yet unexpressed opinions about her working conditions.   The Friday before Steele attended her second HR consultation, she spoke with her supervisors.   That following Monday, Steele

---

[31] *See Acrey*, 981 F.2d at 1572–73 (finding intolerable working conditions, in part, based on evidence that plaintiff's supervisors excluded or limited her participation at various work-related meetings).

[32] *Johnson*, 594 F.3d at 1216–17 n.6 ("[plaintiff's coworkers] gave her the 'cold shoulder,' sat farther away from her at meetings, became too busy to answer her questions, and generally tried to avoid her. . . [T]hese alleged snubs . . . are insufficient[ly]" adverse).

[33] *See Fischer*, 525 F.3d at 981 (discussing ultimately tolerable working conditions that involved harassing circumstances involving derogatory remarks); *MacKenzie*, 414 F.3d at 1281–82; *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261–62 (10th Cir. 1998); *Bolden v. PRC Inc.*, 43 F.3d 545, 551–52 (10th Cir. 1994).

[34] *See Acrey*, 981 F.2d at 1573–74 (finding intolerable working conditions, in part, based on evidence that plaintiff's supervisors urged her to quit because of her age).

repeated her original complaints to a different HR employee and explained that she had just brought her concerns to her supervisors' attention. Steele left that meeting without submitting a formal complaint and with HR's instruction to keep HR updated about her circumstances. In the few weeks that followed, Steele considered her working environment improved. Somewhat abruptly, however, her opinion changed. She told an HR employee that she was "hanging in there." Then, she learned about an available position outside the Division, and she promptly pursued it. No evidence explains either the specific details that Steele discussed with HR or the specific coworker acts that changed Steele's opinion of her working conditions in late March. Ultimately, these circumstances do not show that HR's wait-and-see approach treated Steele so unreasonably that she could not continue to work and try to resolve her problems.[35] Accordingly, a reasonable employee would not have decided, like Steele, that HR's response left her no choice but to quit the Division.

Eighth, Steele argues that the City paid her but not Lopez less money for different, non-supervisory work. But the facts and the law undermine this comparison. Considering the evidence, Lopez continued to perform supervisory work. Officially, Lopez's new job responsibilities involved supervising private contractors. In this respect, his new position placed him on the same management tier as his previous position. Steele's argument overlooks this evidence and relies entirely on Brooks' observation that Lopez appeared to no longer supervise Division employees. But even supposing that Brooks' observation created a factual issue

---

[35] *See Narotzky v. Natrona Cty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 566 (10th Cir. 2010) (explaining that plaintiffs had "an alternative to resignation: namely continuing to work . . . and trying to resolve the problem."); *Yearous v. Niobrara Cty. Mem'l Hosp.*, 128 F.3d 1351, 1357 (10th Cir. 1997) (noting that employee freely could have chosen "continuing to work and attempting in good faith to resolve their problems with [their coworker] through internal procedures;" but instead, plaintiffs unreasonably resigned after giving the employer only one month to address their concerns).

surrounding Lopez's job responsibilities, the evidence is legally immaterial.  Lopez's post-April employment arrangement did not contribute to the work atmosphere that motivated Steele's April 18 decision to quit.[36]

In review, Steele's evidence collectively balances too lightly against her substantial evidentiary-production burden.  Steele shows that the City made her working conditions objectively frustrating but not objectively intolerable.  Despite the totality of her frustrating circumstances, Steele received "the opportunity to make a free choice regarding [her] employment relationship."[37]  Among two reasonable alternatives—continuing to work with HR and her supervisors to improve her Division work environment or accepting the available Fire Department position—Steele chose to quit the Division.  No job-jeopardizing or work-defeating acts influenced her decision.  Steele understood the consequences of her decision.  She controlled the timing and pace of her decision.  And she mutually agreed to her departure date.[38]  Title VII, therefore, offers Steele no relief for her constructive discharge-based claims.

Unable to show that the City constructively discharged her, Steele lacks proof for an essential element of her disparate treatment claim.  That essential proof lacking, the Court need not consider the parties' remaining *McDonnell Douglas* burdens.  The Court therefore grants the City summary judgment on Steele's disparate treatment claim.

---

[36] *See Narotzky*, 610 F.3d at 566 (concluding that theft and search incidents that occurred after plaintiffs arranged alternative work did not impact plaintiff's original work atmosphere); *Strickland*, 555 F.3d at 1230 (excluding alternative job offer from constructive discharge circumstances because "[a] reasonable person, at the time [plaintiff] left [defendant], would not have been able to consider this alternative.").

[37] *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004).

[38] *See Narotzky*, 610 F.3d at 565–66 (discussing four, non-determinative factors used to discern "whether there was a constructive discharge").

**B. Hostile Work Environment**

Steele next claims that the City is liable for shaping a work environment so hostile to her race and gender that she had no choice but to quit her Maintenance Manager position. Like disparate treatment, Steele's hostile work environment claim requires evidence that the City's race-based or gender-based conduct "altered the terms or conditions of her employment."[39] For this element, Steele again relies on a theory of constructive discharge. And to that extent, her claim fails for the above-discussed reasons.

Yet, two other defects characterize Steele's hostile work environment claim.

**1. Severe or Pervasive Harassment**

First, just as Steele's evidence fails to show intolerable working conditions, her evidence likewise fails to show "sufficiently severe or pervasive" abuse.[40] To earn Title VII's "hostile" characterization, evidence must show that severe or pervasive "discriminatory intimidation, ridicule, and insult" permeated Steele's work environment.[41] The severe or pervasive standard is disjunctive and, in part, objective—considering all the circumstances "from the perspective of a reasonable person in the plaintiff's position."[42] The severe or pervasive standard accounts for "the frequency of the discriminatory conduct; its severity; whether it is physically threatening of humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[43] Nonetheless, "run-of-the-mill boorish, juvenile, or annoying

---

[39] *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012) (quotation omitted).

[40] *Id.* (quotation omitted).

[41] *Id.* at 664 (quotation omitted).

[42] *Id.* at 664–65 (quotation omitted).

[43] *Id.* at 664 (quotation omitted).

behavior . . . and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard."[44]

Against these standards, Steele's evidence shows neither severe nor pervasive harassment. Specifically toward proving that the City made her workplace hostile, Steele repeats that: (1) Raines ignored her; (2) coworkers excluded her from meetings; (3) no one consulted her before assigning her the snow-event day shift; and (4) Lopez improperly notified her by email of a snow event.

On these circumstances alone, deeming Steele's workplace "hostile" inappropriately would extend Title VII's specific antidiscrimination protections to "general civility code" violations.[45]

Initially, the evidence lacks enough specificity to consider these circumstances pervasive. These circumstances occurred over five months, a relatively limited duration. But apart from evidence of one lunch outing and vague assertions, no evidence details how frequently Raines or others met without Steele. Steele complains about Brooks' initial consultation failure but not about the day shifts she worked as a result. And Lopez's snow-event notification error concerned only one of those seven shifts. Two miscommunications and Steele's indefinite assertions of repeated exclusion objectively demonstrate "isolated incidents" more than a "steady barrage" of harassment.[46]

Pervasiveness aside, these circumstances do not constitute objectively severe, threatening, or work-defeating harassment. Often, objectively severe harassment involves direct

---

[44] *Id.* (quotation and quotation marks omitted).

[45] *Id.* at 663 (quotation omitted).

[46] *Id.* at 666 (quotation omitted) (citing illustrative non-pervasive and pervasive harassment cases).

physical harm.[47]   No evidence shows that Steele circumstances ever involved actual or threatened physical harm.  If not severe because of physical harm, objectively severe harassment must meaningfully interfere with an employee's work performance.[48]   Only Lopez's deficient snow event notice objectively affected Steele's work performance.  But the brief delay caused by Lopez's error more appropriately resembles a non-severe inconvenience than a severe and unreasonable interference with Steele's work, particularly because Steele nonetheless completed her work without receiving criticism or discipline.[49]   Likewise, no evidence shows that coworkers' noninvolvement of Steele involved any harassment more substantial than rude but "ordinary socializing."[50]   Thus, no evidence distinguishes Steele's colleagues' acts from the non-severe, general civility code violations that all employees must endure.

## 2. Race-based or Gender-based Harassment

The remaining defect that defeats Steele's hostile work environment claim relates to inadequate prima facie proof that she suffered abuse "based on" her race or gender.[51]   With respect to her hostile work environment claim, Steele relies heavily on the circumstantial evidence that she was the only African-American and female manager in the Division.  But

---

[47] *See id.* at 666–67 (distinguishing plaintiff's non-severe "hitting" incidents from severe instances where other plaintiffs faced sexual assault, rape, battery resulting in broken bones, or being punched in the ribs and sprayed with mace).

[48] *See Chavez v. New Mexico*, 397 F.3d 826, 834–35 (10th Cir. 2005) (describing "incidents of harassment . . . that interfered with [plaintiffs'] work performance or otherwise altered the conditions of their employment," like meddling with client relationships or assigning menial work responsibilities unrelated to plaintiff's position).

[49] *See id.*; *MacKenzie*, 414 F.3d at 1280–81 (considering an untimely workplace communication "a mere inconvenience").

[50] *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007) ("juries ought not find prohibited harassment merely based on ordinary socializing"); *see also Somoza v. Univ. of Denver*, 513 F.3d 1206, 1218 (10th Cir. 2008) (remarking that employees must withstand "colleagues that do not like them, are rude, and may be generally disagreeable people.").

[51] *Lounds*, 812 F.3d at 1222 (quotation omitted).

"[s]imply being the lone member of an identifiable racial or [other] minority within [a work department], without more, does not demonstrate racial animus."[52] And importantly, none of the abuse that Steele identifies is overtly race-based or gender-based. Typically, overtly discriminatory abuse must occur to impute discriminatory animus to other facially neutral abuse.[53] Whatever abuse Steele suffered, no facts show that Steele's coworkers targeted her for abuse based on her race or gender.[54]

Unable to show that the City targeted her for severe or pervasive, let alone intolerable, race-based or gender-based harassment, the Court grants the City summary judgment on Steele's hostile work environment claim.[55]

## IV.    Conclusion

Steele's race and gender made her unlike any other manager in the City's Street Maintenance and Traffic Operations Division. And in that role, Steele certainly may have suffered the inconsiderate and inexpert acts of coworkers. But according to the produced evidence, she did not suffer the discriminatory kind and intolerable degree of workplace discomfort necessary under Title VI to hold the City liable.

---

[52] *Chavez*, 397 F.3d at 832.

[53] *See id.* at 833 ("Conduct that appears gender-neutral in isolation may in fact be gender-based, but may appear so *only when viewed in the context of other gender-based behavior*.") (emphasis added).

[54] Likewise, the same defect ultimately dooms Steele's disparate treatment claim. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) ("[A] disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.").

[55] Because no genuine factual dispute exists about whether Steele suffered an unlawful employment practice, the Court need not determine whether Title VII holds the City is liable. *See generally Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. Boca Raton*, 524 U.S. 775 (1998).

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 53) is hereby **GRANTED**.

**IT IS SO ORDERED**.

Dated this 18th day of May, 2016.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE